UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

U1IT4LESS, INC. d/b/a NYBIKEGEAR,

                                    Plaintiff,                    **OPINION AND ORDER**

                    - against -                                   11-CV-7163 (CS)

FEDEX CORPORATION, FEDEX CORPORATE
SERVICES, INC., and FEDEX GROUND PACKAGE
SYSTEM, INC.,

                                    Defendants.
-------------------------------------------------------------------x

Appearances:
Michael J. Paleudis
The Paleudis Law Firm
Putnam Valley, NY

H. Kenneth Kudon
Kudon Law
Potomac, MD

Joe R. Whatley
R. Jackson Drake
Edith M. Kallas
Ilze C. Thielmann
Whatley Drake & Kallas, LLC
New York, New York
*Counsel for Plaintiff*

P. Daniel Riederer
FedEx Legal Department
Memphis, TN
*Counsel for Defendants FedEx Corporation and FedEx Corporate Services, Inc.*

Joeseph P. McHugh
FedEx Ground Package System, Inc.
Moon Township, PA
*Counsel for Defendant FedEx Ground Package System, Inc.*

Seibel, J.

Before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint pursuant to Rules 9(b) and 12(b)(6), (Doc. 42). For the following reasons, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

## I.      **Background**

For purposes of Defendants' Motion, I accept as true the facts (but not the conclusions) as stated in the Second Amended Complaint ("SAC"). Plaintiff is an internet retailer that sells motorcycle gear such as helmets, boots, goggles, chaps, jackets, and vests, shipping within the United States and internationally. (SAC ¶ 21.) Defendant FedEx Ground Package System, Inc. ("FedEx Ground"), a Delaware corporation with its principal place of business in Moon Township, Pennsylvania, ships and delivers small packages by motor carrier in the United States and Canada. (*Id.* ¶ 28.) Defendant FedEx Corporation ("FedEx"), a Delaware Corporation with its principal place of business in Memphis, Tennessee, is the parent corporation of FedEx Ground. (*Id.* ¶ 26.) Until FedEx acquired and rebranded it, FedEx Ground was Roadway Package System, a subsidiary of Caliber Systems, Inc. with its principal place of business in Pittsburgh, Pennsylvania. (*Id.* ¶ 31.) FedEx Ground is one of only two companies that provide fast and reliable small package delivery services both nationwide and internationally. (*Id.* ¶ 32.) FedEx funds, controls, and oversees FedEx automation software and the information technology involved in weighing, measuring, rating, pricing, billing, and paying for FedEx Ground's services. (*Id.* ¶ 26.) FedEx is also the parent company of Defendant FedEx Corporate Services, Inc. ("FedEx Services"), a Delaware corporation with its principal place of business in Memphis, Tennessee. (*Id.* ¶¶ 26-27.) FedEx Services manages, supports, and provides customer service

2

for the information technology used in connection with scanning, data collection, sorting, weighing, measuring, rating, and billing for FedEx Ground. (*Id.* ¶ 27.)

FedEx Ground neither handles its own billing nor provides online or software driven shipping solutions; these functions are performed by FedEx Services and overseen by FedEx. (*Id.* ¶ 34.) FedEx automation software and website access to fedex.com are licensed to customers of FedEx Ground so that they can both electronically transmit shipment details (such as package weight and dimensions) to Defendants and receive shipment information (such as status, history, and account summaries) from Defendants. (*Id.* ¶¶ 34-35.) Following a pick-up by a FedEx Ground truck, packages are forwarded to FedEx Ground's nearest hub or automated satellite for sorting and processing. (*Id.* ¶ 36.) As a package works its way through the hub or satellite, information technology managed and supported by FedEx Services automatically calculates the package's weight and physical dimensions and routes it based on information encoded on the shipping label. (*Id.* ¶ 38.)[1] Charges, surcharges, and fees for packages shipped by FedEx Ground are computed based on a number of factors, including package weight. (*Id.* ¶ 42.) For packages smaller than three cubic feet, the package weight is the actual weight; for larger packages, it is the greater of the actual weight or dimensional weight (length times width times height). (*Id.* ¶ 43.)

A.      The "Upweighting" Scheme Allegations

Plaintiff was a customer of FedEx Ground from about July 2008 until August 2010. (*Id.* ¶ 22.) Plaintiff licensed FedEx automation software so that Plaintiff could transmit details of

---

[1] The SAC implies that FedEx does not control or oversee this stage of FedEx Services's operations. (*Compare* SAC ¶ 38 (not specifically alleging FedEx control or oversight of automatic weight and dimension calculation), *with id.* ¶ 41 (specifically alleging FedEx control and oversight of automatic package routing).)  This is somewhat inconsistent with the allegation that "FedEx has funded and overseen and FedEx Services has managed and supported the alteration and operation of such information technology in connection with weighing, computing and transmitting charges, and collecting payment for packages transported by FedEx Ground." (*See id.* ¶ 68.B.)

each of its shipments to Defendants, print shipping labels, and schedule pick-ups with FedEx

Ground. (*Id.* ¶ 23.)  Plaintiff also purchased a scale (to weigh packages) from a FedEx

authorized vendor. (*Id.* ¶ 24.)  Nearly all of the packages Plaintiff shipped via FedEx Ground

were smaller than three cubic feet and therefore were rated based upon their actual weight. (*Id.*;

*see id.* ¶ 60.)

Plaintiff shipped hundreds of packages weekly via FedEx Ground. (*Id.* ¶ 51.)  Over the

period from March 2009 to May 2010, Plaintiff was charged for a shipment weight that was

greater than the actual package weight at least 150 times. (*See id.* ¶¶ 57-58, 74; *see also*

Plaintiff's First Amended RICO Statement ("RICO Stmt."), (Doc. 31), Ex. A.)[2]  Internet postings

dating from 2007 onward indicate that others experienced the same pattern of upweighting. (*Id.*

¶¶ 49, 78.)  According to the SAC, such upweighting is the result of "a continuing scheme or

artifice to defraud" Plaintiff and others, (*id.* ¶ 46), in furtherance of which Defendants FedEx and

FedEx Services perpetrated, among other things, the following:  "commandeering, designing or

altering the design of, [or] managing and supporting information technology that can cause

package weight . . . to be fixed at a fictive higher weight than its actual weight," (*id.* ¶ 47.A);

"seeking and receiving payment . . . for artificially inflated charges attributable to upweighting,"

(*id.* ¶ 47.D); and "perpetuating, facilitating and concealing upweighting . . . and attempting to

unfairly shield themselves from liability by creating and implementing a labyrinthine and corrupt

BRE [billing and revenue enhancement] Model . . . which incorporates a 'caveat emptor' billing

process with little or no quality control, a byzantine online and email-based invoicing system . . .

---

[2] The SAC incorporates by reference the RICO Stmt. (SAC ¶ 74.) Exhibit A of the RICO Stmt. lists the date, tracking number, actual weight, and "upweight" of approximately 150 of Plaintiff's packages shipped over a period of about fourteen months. (RICO Stmt. Ex. A.) The dates of invoices and bank debit notifications for a number of shipments are listed in Exhibit B. (*Id.* Ex. B.)

that obscures billing discrepancies, and . . . includes draconian billing adjustment terms and conditions, and other unfair and deceptive structures, terms and tools designed to disadvantage customers in their transactions with defendants," (*id.* ¶ 47.E). For example, Defendants' billing system disaggregates charges for a single shipment into many different statements, "with no single invoice itemizing and totaling all the charges included in each transaction," making it difficult for shippers to piece together the total charge for a single shipment. (*Id.* ¶ 47.E.i.) Plaintiff alleges that the upweighting it experienced cannot be unintentional because its upweighted packages were not confined to a specific facility or zone, and others experienced the same upweighting. (*Id.* ¶ 49.)

Plaintiff first became aware of an upweighted shipment when two employees of FedEx Services visited Plaintiff on September 15, 2010. (*Id.* ¶ 55.) Plaintiff later identified 150 specific examples of upweighting. (*Id.* ¶ 57.) Plaintiff apparently informed a representative of FedEx Services of these upweighted transactions. (*See id.* ¶ 61.) In response, FedEx Services, in correspondence dated November 15, 2010, acknowledged that such upweighting occurred in hundreds of instances, and agreed to re-rate roughly 200 shipments. (*Id.* ¶ 62.)[3] On January 7, 2011, Plaintiff received a check for $134.45 issued by FedEx referencing a single invoice number. (*Id.* ¶ 64.)

---

[3] Defendants included an apparent copy of the email correspondence as Exhibit 1 to its Reply in Support of Defendants' Motion to Dismiss ("Ds' Reply Mem."), (Doc. 49), and dispute the SAC's characterization of it as an admission of upweighting, (*id.* at 13-14). If Defendants intended to dispute allegations in the SAC based on documentary evidence – which would have been permissible here because the November 15, 2010 email is relied upon in the SAC, *see, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) – the document should have been submitted with Defendants' opening brief. *Cf. Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by the court.") (collecting cases). In any event, the email plainly contains a statement that about 200 packages would be re-rated downward, and whether it contains an acknowledgement of upweighting is immaterial to the disposition of the instant Motion.

Plaintiff alleges that FedEx and FedEx Services have conducted and participated in the affairs of the FedEx Ground Enterprise (consisting solely of FedEx Ground, (*id.* ¶ 66)) through a pattern of racketeering activity in violation of Section 1962(c) of the Racketeer Influenced and Corrupt Organizations ("RICO") Act. (*Id.* ¶ 68.)  According to the SAC:  FedEx heads a hierarchical decision-making structure led by its information technology management team – headed by Robert B. Carter, an officer of both FedEx and FedEx Services – which oversees the relevant activities of FedEx Services, (*id.* ¶ 68.A); FedEx has commandeered control of and funded and overseen the alteration and operation of certain information technology – managed and supported by FedEx Services – in connection with weighing, computing, and transmitting charges, and collecting payment for packages transported by FedEx Ground, (*id.* ¶ 68.B); FedEx and FedEx Services have used electronic transmissions to exchange data relating to customer charges, (*id.* ¶ 68.D); and FedEx Services has used the United States mails and electronic transmissions to assess charges and obtain payment for packages transported by FedEx Ground, (*id.* ¶ 68.E).  Plaintiff alleges that FedEx and FedEx Services have violated 18 U.S.C. §§ 1341 and 1343 "in what likely involved millions of separate instances, [by making] use of U.S. mails and interstate wire facilities in the form of, among others, emails, credit card transmissions and electronic funds transfers." (*Id.* ¶ 71.)  Plaintiff further alleges that FedEx, FedEx Services, and FedEx Ground violated 49 U.S.C. § 13708(b) ("Section 13708(b)") by communicating documents containing inflated charges attributable to upweighting. (*Id.* ¶ 146.)  Plaintiff also alleges that FedEx and FedEx Services have violated Section 349 of New York General Business Law ("Section 349") by perpetrating the upweighting in New York. (*Id.* ¶¶ 150, 154.)

**B.     Conspiracy Allegations**

United Parcel Service, Inc. ("UPS") is not a party to this litigation.  UPS and FedEx

Ground are the two leading small package ground delivery companies.  (*Id.* ¶ 32.)  Plaintiff

alleges that UPS has implemented a billing revenue enhancement model similar to FedEx's, (*id.*

¶ 87), and that UPS has changed the dimensions of packages qualifying for dimensional

weighting in an upward direction, (*id.* ¶ 88).  UPS and FedEx announced a mutual corporate

policy to prevent customers from using third-party consultants to negotiate contracts, audit

invoices, and process claims on behalf of shippers who use FedEx Ground and UPS.  (*See id.* ¶¶

90-91.)  Plaintiff alleges that such mutual policy served the purpose of concealing, maintaining,

and perpetuating FedEx's and UPS's upweighting schemes, (*id.* ¶ 92), which could not be

maintained in the policy's absence, (*id.* ¶ 93), and thus amounts to a conspiracy to violate

Section 1962(c) in violation of Section 1962(d) of the RICO Act, (*see id.* ¶ 94).

**C.     The "Canadian Customs" Scheme Allegations**

Under FedEx's standard agreements, the shipper pays Canadian customs or duties, taxes,

and related charges ("Canadian Customs") on shipments from the United States to Canada,

unless the shipper informs FedEx that the package recipient is to pay such charges.  (*Id.* ¶ 106.)

Although Plaintiff designated on each package it shipped to Canada that the recipient would pay,

Plaintiff was repeatedly charged for Canadian Customs.  (*Id.* ¶ 107.)  Despite either making no

attempt to collect Canadian Customs from package recipients or actually collecting from them,

Defendants nevertheless notified Plaintiff by U.S. mail that they were unable to collect the

Canadian Customs, and electronically debited Plaintiff's bank account for the same.  (*Id.* ¶ 108.)

Plaintiff notified FedEx Services of these overcharges on or about September 28, 2009,

(*id.* ¶ 110), and FedEx Services represented by correspondence dated October 8, 2009 that such

7

charges were erroneous and due to a FedEx software problem which had been corrected, (*id.* ¶¶ 111-12). Nevertheless, Plaintiff continued to be improperly charged – at least 150 times – for Canadian Customs. (*Id.* ¶ 113.) According to Plaintiff, such charges are the result of a "continuing scheme to defraud United States shippers who designated the Canadian recipient of packages shipped by FedEx Ground as payer of [Canadian Customs]." (*Id.* ¶ 115.) In furtherance of this scheme, Plaintiff alleges that FedEx and FedEx Services have issued notifications that they were unable to collect Canadian Customs, despite not attempting to collect or actually collecting the same, (*id.* ¶ 116.A), and "developed and implemented the corrupt and labyrinthine BRE Model" alleged in connection with the upweighting scheme, (*id.* ¶ 116.B).

Plaintiff alleges that FedEx and FedEx Services have conducted and participated in the affairs of the FedEx Ground Enterprise (consisting solely of FedEx Ground, (*id.* ¶ 118)) through a pattern of racketeering activity in violation of Section 1962(c) of the RICO Act. (*Id.* ¶ 119.) According to Plaintiff, FedEx and FedEx Services transmitted by U.S. mail and wire false statements contained in correspondence, billing statements, or notices of inability to collect, in violation of 18 U.S.C. §§ 1341 and 1343, (*id.* ¶ 122-23), and such transmissions contained knowing and intentional misrepresentations about Canadian Customs charges, (*id.* ¶ 124). Plaintiff further alleges that FedEx, FedEx Services, and FedEx Ground violated Section 13708(b) by communicating documents containing improperly-assessed Canadian Customs charges. (*Id.* ¶ 146.) Plaintiff also alleges that FedEx and FedEx Services have violated Section 349 by fraudulently assessing the Canadian Customs charges in New York. (*Id.* ¶¶ 150, 154.)

### D.    The "Missing Discount" Scheme Allegations

Under a FedEx Pricing Agreement,[4] Plaintiff is entitled to certain discounts when it or others ship packages by FedEx Ground under its FedEx-assigned billing number.  (*Id.* ¶ 139.) Since at least as early as 2009, Defendants failed to apply or improperly applied such discounts. (*Id.* ¶ 140.)  Plaintiff alleges that FedEx, FedEx Services, and FedEx Ground violated Section 13708(b) by communicating documents containing charges that did not reflect the promised discounts.  (*Id.* ¶ 146.)  Plaintiff also alleges that FedEx Ground, as party to the FedEx Pricing Agreement, was and is under a duty to ensure that discounts are properly applied to charges assessed for its services.  (*Id.*)

### E.    Procedural Posture

Plaintiff commenced this action by filing a Complaint on March 11, 2011, (Doc. 1), and subsequently filed an Amended Complaint on May 27, 2011, (Doc. 27), and the SAC on August 29, 2011, (Doc. 41).  Plaintiff brings claims against FedEx and FedEx Services for substantive RICO in violation of 18 U.S.C. § 1962(c) (Counts I and III), RICO conspiracy in violation of 18 U.S.C § 1962(d) (Count II), and violation of Section 349 (Count V).  Plaintiff brings a claim against all Defendants for violation of Section 13708(b) (Count IV).

Defendants move to dismiss the SAC on the following grounds:  (1) as to all claims, a License Agreement and E-Agreement require Plaintiff to have sued in the Western District of Tennessee within one year of any claim arising against Defendants, and Plaintiff has not done so, (*see* D's Mem. 20-21); (2) as to all RICO claims (Counts I, II, and III), Plaintiff has failed to plead (a) that FedEx Ground is a RICO "enterprise" distinct from RICO "persons" FedEx and

---

[4] The SAC is ambiguous as to whether there is only one such agreement, (*see* SAC ¶ 146), or more than one, (*see id.* ¶ 139).  Defendants' brief is similarly ambiguous.  (*See* Memorandum in Support of Defendants' Motion to Dismiss ("Ds' Mem."), (Doc. 43), 9 n.6.)

9

FedEx Services, (b) facts showing the required relatedness or continuity of RICO "predicate acts," (c) facts plausibly or particularly demonstrating that Defendants committed the RICO predicate acts, and (d) facts plausibly demonstrating that FedEx or FedEx Services participated in the operation or management of the alleged RICO enterprise, (*see id.* at 24-33); (3) as to the RICO conspiracy claim (Count II), Plaintiff has failed to adequately plead a conspiracy, (*see id.* at 33-39); (4) as to the Section 13708(b) claim (Count IV), there is no private right of action, and Plaintiff has not alleged a violation of Section 13708(b), (*see id.* at 39-44); and (5) as to the state-law claim (Count V), it is preempted and Plaintiff has failed to state a plausible claim, (*see id.* at 44-48).

## II.    Legal Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

10

In considering whether a complaint states a claim upon which relief can be granted, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

## III.    Discussion

### A.    Defenses Based on Contract

When deciding a motion to dismiss, ordinarily the court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *accord Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). But the court can also consider documents where the complaint relies heavily on their terms and effect – that is, documents "integral" to the complaint. *See Chambers*, 282 F.3d at 153. Such reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.* Furthermore, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner*, 463 F.3d at 134.

11

Defendants argue that the SAC "implicates" the Service Guide,[5] License Agreement,[6] and E-Agreement[7] on its face, (Ds' Mem. 9), and that Plaintiff alleges facts "regarding, and thus, 'with respect to,' Plaintiff's use of FedEx software under the License Agreement and E-Agreement," (*id.* at 20-21). In arguing for dismissal based on the License Agreement and E-Agreement, Defendants rely on provisions of both that require claims arising with respect to the use of certain FedEx software to be brought in the Western District of Tennessee within one year. (*Id.* at 15-16.) Even assuming that the Service Guide, License Agreement, and E-Agreement are "integral" to the complaint, I find that they nevertheless do not govern the conduct of which Plaintiff complains.

With respect to both the License Agreement and the E-Agreement, Plaintiff has not alleged any wrongdoing relating to the operation of the software covered by these agreements; Plaintiff instead alleges that the wrongdoing occurred on Defendants' end, after Plaintiff had used the software to properly input package weights and transmit shipping information to Defendants. (SAC ¶¶ 47.A-B, 116.) It is at that point that Defendants are alleged to have upweighted packages, improperly charged Canadian Customs, and/or improperly failed to apply discounts. Because Plaintiff's claims do not arise out of Plaintiff's use of Defendants' licensed software, the clauses of the License Agreement and E-Agreement requiring that suits regarding that software be brought in the Western District of Tennessee within one year do not apply.[8]

---

[5] "Service Guide" refers to the 2010 FedEx Service Guide, attached as Exhibit 2 of the Affirmation of P. Daniel Riederer in Support of Defendants' Motion to Dismiss ("Riederer Aff."), (Doc. 44).

[6] "License Agreement" refers to the FedEx Ship Manager Software End-User License Agreement. (Riederer Aff. Ex. 3.)

[7] "E-Agreement" refers to the FedEx Automation E-Agreement. (Riederer Aff. Ex. 4.)

[8] It is unclear whether Defendants actually argue that provisions of the Service Guide constitute an independent basis for dismissal. (*See* Ds' Mem. 11-15.) Defendants note that the Service Guide contains provisions requiring that "[r]equests for invoice adjustment due to an overcharge . . . be made to [FedEx] Ground within 180

### B.   Civil RICO

The civil RICO statute makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).  Defendants argue that Plaintiff's Section 1962(c) RICO claim fails as a matter of law because Plaintiff fails to allege (1) an adequately distinct enterprise, (Ds' Mem. 23-27); (2) the required "pattern of racketeering activity," (*id.* at 27-28); (3) plausible or particularly-pleaded predicate acts of mail and/or wire fraud, (*id.* at 28-32); and (4) the required operation or control, (*id.* at 32-33).  I address each of these in turn.

#### *1.   Distinctness*

"[T]o establish liability under § 1962(c), one must allege and prove the existence of two distinct entities:  (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *see City of N.Y. v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 447 (2d Cir. 2008) ("[T]he

---

days" and "any civil claim for overcharges . . . be made within 18 months." (*Id.* at 13 (alterations and internal quotation marks omitted).)  Defendants assert that Plaintiff "fails to plead the complete history of pre-suit adjudication of its inflated charge assertions for even a single package." (*Id.* at 14.)  But then Defendants go on to conclude that that failure "has rendered it impossible to assess the plausibility of Plaintiff's allegation that certain charges should have been corrected by [FedEx] Ground because they were inflated.  In view of this impossibility, Plaintiff's allegations of overcharges are certainly not 'facially plausible.'" (*Id.* at 14-15.)  This argument misses the mark.  The plausibility of Plaintiff's allegations is based on the factual content of the SAC as a whole.  The SAC plausibly pleads that Plaintiff complained of overcharges to Defendants, and that Defendants did not correct them. (SAC ¶¶ 53-64; 110-13.)  A detailed pleading of the "complete history of pre-suit adjudication for even a single package" is not required to reach this conclusion.  Whether FedEx Ground knew of and failed to correct any particular overcharge has little, if any, bearing on the plausibility of the larger allegations that FedEx and FedEx Services engaged in a course of fraudulent conduct involving regular overcharges.  This is a suit concerning an alleged fraudulent and widespread course of conduct, affecting numerous shipments over an extended period of time.  The claim does not rise and fall on any single overcharge or group of overcharges not being corrected.  Thus, to the extent that Defendants argue that "failure to plead a complete pre-suit adjudication for even a single package" constitutes a basis for dismissal of the suit, I disagree.  Even if some transactions are outside the limits set forth in the Service Guide, the claims are still plausible to the extent described below.

distinctness doctrine requires a plaintiff to demonstrate that the RICO person is legally separate from the RICO enterprise . . . ."), *rev'd on other grounds sub nom. Hemi Group, LLC v. City of N.Y., N.Y.*, 130 S. Ct. 983 (2010).

Defendants, relying principally on *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055 (2d Cir. 1996), argue that the FedEx Ground Enterprise (consisting solely of FedEx Ground) is not distinct from its parent FedEx or from its sister FedEx Services because all are "businesses operating in a 'unified corporate structure.'" (Ds' Mem. 24-25.) Defendants cite a number of cases from within this district, many relying on *Discon*, as holding that RICO distinctiveness is not satisfied when the RICO "person" and "enterprise" are "companies in the same corporate family carrying out their regular business." (*Id.* at 25-26.) Plaintiff argues that the Supreme Court in *Cedric Kushner* "sharply limited" *Discon*, and that RICO distinctness is satisfied by the formal corporate distinctness here. (*See* P's Mem. 22-24).[9]

*Cedric Kushner* held that "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Cedric Kushner*, 533 U.S. at 163. In so holding, the Court relied both on the legal effect of incorporation, *see id.* ("[I]ncorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs."), and on the statutory definition of RICO "person" and RICO "enterprise," *see id.* ("person" includes "individual"; "enterprise" includes "corporation").

---

[9] "P's Mem." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss. (Doc. 47.)

The Court's logic applies here, where a parent corporation and its subsidiary are alleged to be the RICO "person," and a separately incorporated subsidiary is alleged to be the RICO "enterprise." (SAC ¶¶ 45, 65-66.) As separately incorporated legal entities, FedEx and its subsidiaries FedEx Services and FedEx Ground are each "distinct legal entit[ies], with legal rights, obligations, powers, and privileges different from" each other, just like a corporate owner/employee and the corporation itself. *See Cedric Kushner*, 533 U.S. at 163. And, the RICO statute contemplates corporations being both "person" and "enterprise." *See* 18 U.S.C. § 1961(3) ("person" includes "any . . . entity capable of holding a legal or beneficial interest in property"); *id.* § 1961(4) ("enterprise" includes a "corporation"); *cf. Cedric Kushner*, 533 U.S. at 163 (analyzing the statutory definitions of "person" and "enterprise" to support distinctness conclusion). The logic of *Cedric Kushner* thus renders plausible the conclusion that the FedEx Ground Enterprise is distinct from FedEx and FedEx Services.[10] *See Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 82 (D.D.C. 2006) (the "fundamental principle articulated in *Kushner*" is "that so long as two entities 'are not legally identical,' they are sufficiently distinct for one to be named as a RICO person and the other as a RICO enterprise") (quoting *Cedric Kushner*, 533 U.S. at 166).[11]

---

[10] Further, although I need not definitively decide the issue, the SAC plausibly alleges that FedEx Ground, originating as a separate company and with separate corporate headquarters, may not merely be part of FedEx's "unified corporate structure," *Discon*, 93 F.3d at 1064, and may not be the equivalent of a division operating within FedEx, *see Panix Promotions, Ltd. v. Lewis*, No. 01-CV-2709, 2002 WL 72932, at *6 (S.D.N.Y. Jan. 17, 2002) (citing *Discon*, 93 F.3d at 1063-64). Thus, even if *Discon* retained some vitality, the claim might still survive at this stage.

[11] *Cedric Kushner* specifically distinguished and declined to address *Discon*. *See Cedric Kushner*, 533 U.S. at 163. But even if *Discon* is still good law despite the logic of *Cedric Kushner*, it differs from this case in that *Discon* addressed an "enterprise" alleged to consist of a parent and two of its subsidiary corporations, where each of the three constituent corporations was alleged to be the RICO "person," *Discon*, 93 F.2d at 1057, and held that this arrangement did not satisfy the RICO distinctness requirement, *id.* at 1064. *Discon* simply did not address the situation here, where there is no overlap between the entities constituting the "person" and the entities constituting the "enterprise."

2.      *Pattern of Racketeering Activity – Relatedness and Continuity*

a.      <u>Legal Standard</u>

A "pattern of racketeering activity" is defined as at least two predicate acts of

racketeering within ten years of one another. *See* 18 U.S.C. § 1961(5). A "pattern" requires (1)

"relatedness" among the predicate acts, and (2) acts that "themselves amount to, or . . . otherwise

constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S.

229, 240 (1989) (emphasis in original). Relatedness means "acts that have the same or similar

purposes, results, participants, victims, or methods of commission, or otherwise are interrelated

by distinguishing characteristics and are not isolated events." *Id.* (internal quotation marks

omitted); *see Cosmos Forms Ltd. v. Guardian Life Ins. Co.*, 113 F.3d 308, 310 (2d Cir. 1997)

("A relationship to show the existence of a pattern is indicated by temporal proximity of the acts,

by common goal, methodology, and their repetition."). Regarding the continuity requirement, a

"plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (i.e.,

past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern

of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)."

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004) (internal

quotation marks omitted). "To satisfy open-ended continuity the plaintiff need not show that the

predicates extended over a substantial period of time but must show that there was a threat of

continuing criminal activity beyond the period during which the predicate acts were performed."

*Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). In the

Second Circuit, two years of activity is usually required to establish a "substantial period of

time" in the context of closed-ended continuity, *see First Capital Asset Mgmt.*, 385 F.3d at 181;

*Cofacrédit*, 187 F.2d at 242 (collecting cases), although a shorter period may also suffice in

16

"rare" circumstances, *see Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d

Cir. 2008).

> b.    Relatedness

I find that Plaintiff has plausibly alleged relatedness of the predicate acts, as Plaintiff has

clearly alleged at least that the acts are "interrelated by distinguishing characteristics and are not

isolated events." *See H.J. Inc.*, 492 U.S. at 240.  Plaintiff has alleged approximately 150

specifically-identified instances of upweighting, (SAC ¶ 49), and approximately 150 specifically-

identified instances of Canadian Customs overcharges, (*id.* ¶ 113).  The numerous acts of both

upweighting and Canadian Customs overcharges all share distinguishing characteristics and are

clearly not isolated events. *See H.J. Inc.*, 492 U.S. at 240.  Furthermore, Plaintiff has alleged a

detailed "labyrinthine and corrupt BRE Model" through which Defendants "perpetuat[e],

facilitate[e], and conceal[] upweighting" and Canadian Customs overcharges, (SAC ¶¶ 47.E,

116), clearly a common method of commission, *see H.J. Inc.*, 492 U.S. at 240.  Plaintiff has also

alleged a purpose common to all instances of upweighting – namely to "earn[] hundreds of

millions of dollars of illicit profits from the assessment of improper overcharges." (SAC ¶

47.E.viii.)  Profit presumably also motivates the Canadian Customs scheme. (*See id.* ¶ 131

(alleging "millions of dollars in improper overcharges based upon [Canadian Customs]").)  This

suffices to allege relatedness. *See Cosmos Forms*, 113 F.3d at 310 (finding relatedness in

repetitious fraudulent inflation of invoices over a fifteen-month period of time).

> c.    Open-Ended Continuity

I find that Plaintiff has plausibly alleged open-ended continuity.  This case is analogous

to *Cosmos Forms*, in which the Second Circuit held that seventy fraudulently inflated invoices

submitted over fifteen months to one customer satisfied the tests for both relatedness and open-

ended continuity. *See id.* Here, Plaintiff alleges numerous instances of upweighting and Canadian Customs overcharges, over approximately the same period of time as in *Cosmos Forms*. Furthermore, Plaintiff has adequately alleged a threat of continuing criminal activity. After Plaintiff complained of Canadian Customs overcharges in September 2009, and despite receiving a response on October 8, 2009 that this was due to a FedEx software problem that had been corrected, (SAC ¶¶ 110-12), Plaintiff continued to be improperly charged for Canadian Customs, (*id.* ¶ 113; RICO Stmt. Ex. B). Similarly, Defendants are alleged to have been on notice since at least 2007 of upweighting overcharges, and nevertheless continued to upweight. (SAC ¶ 49, 78.)[12] These allegations plausibly imply the requisite threat of continued overcharges.

### d.   Closed-Ended Continuity

I also find that Plaintiff has adequately pleaded closed-ended continuity with respect to the upweighting scheme, because Plaintiff has plausibly alleged upweighting for more than two years within the period from 2007 to 2010. Plaintiff alleges the date and the nature of numerous particular instances of upweighting – including the date of the shipment, its tracking number, the original weight, and the shipment weight for which it was charged – spanning nearly seventeen months. (*See id.* ¶¶ 57-58; RICO Stmt. Ex. A).[13] In addition to these specific allegations, Plaintiff has alleged that "[a]s early as 2007, individuals posted reports of upweighting to online discussion forums," (SAC ¶ 78), and that "[p]ostings by consumers on numerous Internet

---

[12] Whether the Internet postings dating from 2007 are true or not, their existence – unlikely to have been missed by Defendants – constitutes notice of the alleged practice to which Plaintiff was actually subjected (assuming the truth of the facts in the SAC) two years later.

[13] Although Plaintiff argues that it has specifically-alleged predicate acts over fourteen months, (*see* P's Mem. 27), it appears to the Court that the particularly-alleged instances of upweighting date from January 7, 2009 to June 1, 2010, a nearly seventeen-month period, (*see* SAC ¶ 57; RICO Stmt. Ex. B). Obviously, this only strengthens the plausibility of closed-ended continuity with respect to the upweighting scheme.

websites [from 2007 on] indicate that many consumers have experienced the same pattern of upweighting by defendants as plaintiff has experienced," (*id.* ¶ 49).[14]  Thus, between the numerous specifically-alleged predicate acts and the generally-alleged Internet reports, I find that Plaintiff has plausibly alleged closed-ended continuity with respect to the upweighting scheme.

### 3.     *Particularity of Predicate Acts*

"A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).  Furthermore, for a civil RICO claim such as this one, where the alleged predicate acts are frauds, a plaintiff must plead these acts with particularity under Federal Rule of Civil Procedure 9(b).  *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999).  "[T]he complaint [must] specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff[] contend[s] the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements," as well as "allege facts that give rise to a strong inference of fraudulent intent." *Id.* (internal quotation marks omitted); *accord Spool*, 520 F.3d at 185.

I find that Plaintiff has plausibly alleged the predicate acts of mail and/or wire fraud with sufficient particularity.  Plaintiff has specified numerous instances of fraudulent upweighting and improper assessment of Canadian Customs charges, specifying their date and nature. (*See* RICO Stmt. Exs. A, B.)  Having set forth details of Defendants' BRE Model – *e.g.*, the disaggregation of charges that obfuscates the overcharges, (*see* SAC ¶¶ 47, 116) – and how FedEx and FedEx

---

[14] Internet postings would obviously be hearsay if relied on for their truth on summary judgment or at trial, but in the context of the instant motion and in the circumstances of this case, the postings contribute to the plausibility of closed-ended continuity.

Services participated in billing Plaintiff and others for inflated weights and improper Canadian Customs charges, (*see id.* ¶¶ 26-27, 34-43, 47, 116), Plaintiff has also plausibly alleged the existence of a scheme to defraud.  Plaintiff has also specified numerous shipments allegedly giving rise to fraudulent billings, and described the particular mailed or wired communications to which such shipments would give rise, thus satisfying the particularity requirement at this stage. Furthermore, Plaintiff has plausibly alleged facts giving rise to a strong inference of intent. Defendants had both motive (profit) and opportunity (control of billing technology) to perpetrate the alleged frauds, (*see id.* ¶ 47), and, because the upweightings were not confined to a specific facility or zone, (*id.* ¶ 49), they do not appear to be mere administrative errors.  In short, Plaintiff has provided enough detail regarding the predicate acts to withstand the Motion to Dismiss.

> ### 4.    *Operation or Management*

To state a claim under Section 1962(c), Plaintiff must also allege that the Defendants "participate[d] in the operation or management of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  The "operation or management" test is a relatively low bar at the pleading stage, *see First Capital Asset Mgmt.*, 385 F.3d at 176, and requires only that the defendants take "*some* part in directing the enterprise's affairs," *Reves*, 507 U.S. at 179 (emphasis in original).

Plaintiff alleges that FedEx Ground does not handle its own billing, and that "FedEx oversees and FedEx Services performs these functions for FedEx Ground." (SAC ¶ 34.) This allegation alone suffices to hurdle the low bar of the "operation or management" test, as the crux of the conduct that allegedly violated Section 1962(c) was the billing.  But Plaintiff goes further, providing detailed allegations regarding the control and oversight of the information technology used to perpetrate the upweighting and Canadian Customs schemes, and the establishment of the

BRE Model which furthered the schemes by preventing customers from identifying the fraudulent charges. (*See, e.g.*, *id.* ¶¶ 47, 68, 116.) Accordingly, I find that Plaintiff has adequately alleged FedEx's and FedEx Services's "operation or management" of the FedEx Ground enterprise.

For all of the foregoing reasons, I find that Plaintiff has plausibly alleged that FedEx and FedEx Services violated Section 1962(c) with respect to both the upweighting and Canadian Customs schemes. Accordingly, the Motion to Dismiss as to Counts I and III is denied.

### C.   RICO Conspiracy

Section 1962(d) of the RICO Act makes it "unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section." 18 U.S.C. § 1962(d). To allege a conspiracy under Section 1962(d), Plaintiff must plausibly allege facts that imply an "agreement . . . to commit at least two predicate acts." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990); *accord Gov't Employees Ins. Co. v. Hollis Med. Care, P.C.*, No. 10-CV-4341, 2011 WL 5507426, at *10 (E.D.N.Y. Nov. 9, 2011). Although the heightened requirements of Rule 9(b) do not apply to allegations of agreement, *see Hecht*, 897 F.2d at 26 n.4, Plaintiff must nevertheless provide at least some factual basis that would support an inference of conscious agreement, *id.*; *In re Terrorist Attacks on September 11, 2001*, 740 F. Supp. 2d 494, 515 (S.D.N.Y. 2010).

Plaintiff alleges no specific instance of upweighting by UPS, provides no facts regarding the same, and alleges only that "UPS has changed the dimensions of packages qualifying for dimensional weighting in an upward direction causing those packages to be deemed to 'weigh' more." (SAC ¶ 88.) In the absence of any facts supporting this conclusory allegation, I do not find it plausible. Furthermore, I do not find Plaintiff's scant allegations of agreement to commit

21

a RICO violation plausible.  Plaintiff alleges lock-step pricing increases and a mutual corporate policy to exclude third-party consultants among FedEx and UPS, (*id.* ¶¶ 89, 91), and further alleges that these "agreements" are designed to "conceal[], maintain[], and perpetuat[e]" the upweighting scheme, (*id.* ¶¶ 92-93).  But the connection between the factual allegations (lock-step pricing and mutual corporate policy) and the conclusion (designed to maintain the scheme) is absent, and does not plausibly support an allegation of conspiracy under Section 1962(d).  Further, Plaintiff does not allege any harm from FedEx Ground's pricing *per se*, nor does it allege that it used or wished to use a consultant.  In short, even if the allegations regarding UPS's conduct and intent were not conclusory, the allegations that UPS and Defendants acted in concert to enable the upweighting scheme, or that Plaintiff was harmed thereby, are wholly conclusory.

For the foregoing reasons, the Motion to Dismiss Count II is granted.

**D.    Violations of 49 U.S.C. § 13708(b)**

Section 13708(b) states that "[n]o person may cause a motor carrier to present false or misleading information on a document about the actual rate, charge, or allowance to any party to the transaction."  49 U.S.C. § 13708(b).  Plaintiff alleges that FedEx and FedEx Services violated Section 13708(b) in perpetrating both the upweighting and Canadian Customs schemes, (SAC ¶ 146), and by failing to apply or properly apply applicable discounts to which Plaintiff was allegedly entitled under a FedEx Pricing Agreement, (*id.* ¶¶ 139-40, 146).[15]  Plaintiff further alleges that FedEx Ground violated Section 13708(b) because it is a party to the "FedEx Pricing Agreement, the party for whom FedEx and FedEx Services performed billing services and the

---

[15] Defendants note in their brief that the Pricing Agreement is protected by a "robust confidentiality clause," and have offered to provide the Court with a copy for *in camera* review.  (Ds' Mem. 9 n.6.)  Defendants do not argue, however, that the Pricing Agreement itself constitutes a basis for dismissal.  Accordingly, I need not see the content of the Agreement to dispose of this Motion.

party that shipped the packages," and is thus "under a duty to ensure that discounts are properly applied to charges assessed for [its] services." (*Id.* ¶ 146.) Plaintiff admits that Section 13708(b) itself does not authorize a private cause of action, but argues that 49 U.S.C. § 14704(a)(2) does. (P's Mem. 36; *see* SAC ¶ 138). Section 14704(a)(2) provides, in relevant part, that "[a] carrier . . . providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier . . . in violation of this part."

Defendants argue that (1) Section 14704(a)(2) does not authorize a private cause of action at all, (Ds' Mem. 39-41), (2) even if it does, it cannot be used in tandem with Section 13708(b), (*id.* at 41-42), and (3) Plaintiff has not stated a claim under Section 13708(b), (*id.* at 42-44). Because I agree that Plaintiff has not stated a claim under Section 13708(b), for the reasons discussed below, I need not address whether Section 14704(a)(2) creates a private cause of action that can be used to remedy violations of Section 13708(b).

The SAC is less than clear as to how exactly Defendants' alleged conduct violated Section 13708(b), and Plaintiff's brief adds nothing, merely quoting the statutory language, (*see* P's Mem. 39-40). With respect to the upweighting and Canadian Customs allegations, Plaintiff's position appears to be that, by charging Plaintiff for a package at a weight greater than the actual weight of the package, FedEx and FedEx Services "persons" have caused "carrier" FedEx Ground to present false information on a document (*e.g.*, the invoice) about the "actual rate [or] charge."

I find the "actual rate [or] charge" language in Section 13708(b) to be ambiguous. Accordingly, consideration of the statutory context and legislative history in interpreting this statute is appropriate. *See Estate of Pew v. Cardarelli*, 527 F.3d 25, 30 (2d Cir. 2008).

23

Furthermore, the insight of the Surface Transportation Board ("STB") – the agency charged with administration of this statute, *see* 49 U.S.C. § 13501; *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74 (2d Cir. 2001) – merits at least some deference.  *See United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944).  Section 7 of the Negotiated Rates Act of 1993 amended the predecessor of Section 13708 to state:

> (a) REGULATIONS LIMITING REDUCED RATES. – Not later than 120 days after the date of the enactment of this section, the Commission shall issue regulations that prohibit a motor carrier subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title from providing a reduction in a rate set forth in its tariff or contract for the provision of transportation of property to any person other than (1) the person paying the motor carrier directly for the transportation service according to the bill of lading, receipt, or contract, or (2) an agent of the person paying for the transportation.

> (b) DISCLOSURE OF ACTUAL RATES, CHARGES, AND ALLOWANCES. – The regulations of the Commission issued pursuant to this section shall require a motor carrier to disclose, when a document is presented or transmitted electronically for payment to the person responsible directly to the motor carrier for payment or agent of such responsible person, the actual rates, charges, or allowances for the transportation service and shall prohibit any person from causing a motor carrier to present false or misleading information on a document about the actual rate, charge, or allowance to any party to the transaction. Where the actual rate, charge, or allowance is dependent upon the performance of a service by a party to the transportation arrangement, such as tendering a volume of freight over a stated period of time, the motor carrier shall indicate in any document presented for payment to the person responsible directly to the motor carrier for the payment that a reduction, allowance, or other adjustment may apply.

Negotiated Rates Act of 1993, Pub. L. No. 103-180, § 7, 107 Stat. 2044, *repealed by* ICC Termination Act of 1995, § 102(a), Pub. L. No. 104-88, 109 Stat. 803, 804.  Section 7(a) mandated regulations prohibiting "off-bill discounting" – that is "a practice by which motor carriers provide discounts, credits or allowances to parties other than the freight bill payer, without notice to the payer." *See Regulations Implementing Section 7 of the Negotiated Rates*

24

*Act of 1993,* Ex Parte No. MC-180 (Sub-No. 3), 2 S.T.B. 73, 1997 WL 106986, at *1 (Feb. 25, 1997). Section 7(b) – the nearly-verbatim predecessor to Section 13708 – mandated "truth-in-billing" regulations, *i.e.*, regulations requiring disclosure of the "actual rate, charge or allowances for the transportation service[s]." *See id.* at *1 & n.6. The ICC Termination Act of 1995 (which created the STB) repealed the Section 7(a) mandate to issue off-bill discount regulations, and placed the Section 7(b) truth-in-billing requirements directly into Section 13708. *See* §§ 102(a), 103, 109 Stat. at 804, 873; *Regulations Implementing Section 7 of the Negotiated Rates Act of 1993,* 1997 WL 106986, at *2 ("Now, the statute no longer requires that we maintain regulations prohibiting the practice of granting off-bill discounts; it does, however, affirmatively require carriers to disclose certain information when they engage in the practice."); *id.* at *4 ("Off-bill discounting is not prohibited by statute, while truth-in-billing provisions are expressly embodied in the statute."). Thus, the statutory context and legislative history of Section 13708, bolstered by the STB's insight, make clear that Section 13708 requires disclosure of (and prohibits false or misleading information associated with) off-bill discounts and the like. I thus interpret Section 13708(b) to proscribe presentation of a document (such as an invoice) indicating that a customer was charged a certain amount, when in fact the carrier *actually* charged that customer a lesser amount. *See id.* at *1-2.

Under this interpretation, Plaintiff has not stated a claim under Section 13708(b). First, "FedEx Ground no longer does its own billing," (SAC ¶ 34), and thus is not alleged to have presented any information on a document, let alone "false or misleading information." Second, the statute is not directed at activity alleged in connection with the upweighting and Canadian Customs schemes. The statute prohibits invoices hiding off-bill discounts; Plaintiff does not allege that Defendants did that. While the upweighting or Canadian Customs schemes might be

said to involve invoices that *overcharged* Plaintiff, it cannot be said that these invoices misrepresented that a higher rate was charged when actually a lower rate was charged.

With respect to the "missing discounts," Plaintiff alleges it was entitled to receive certain discounts, (*id.* ¶ 139), and that "defendants failed to apply or improperly applied the discounts to which plaintiff was entitled," (*id.* ¶ 140).  This is not the hiding of off-bill discounts to which Section 13708(b) is directed; Defendants are not alleged to have actually granted a discount that did not appear on a bill.  Instead, Plaintiff alleges it was entitled to discounts it did not receive. Section 13708(b) simply does not apply to this activity.

In other words, Section 13708(b) prohibits issuing a bill for amount $x$ when the actual charge is less than $x$.  Here, Defendants are alleged to have actually charged $x$ when by contract Plaintiff should have been charged less than $x$.  Defendants' conduct did not misrepresent the "actual rate [or] charge" within the meaning of Section 13708(b), and thus the Motion to Dismiss Count IV is granted.

### E.   N.Y. General Business Law § 349

To state a claim under Section 349, "a plaintiff must allege:  (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009); *see Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25-26 (1995).  "Consumer-oriented" does not mean that "the defendant committed the complained-of acts repeatedly – either to the same plaintiff or to other consumers – but instead . . . that the acts or practices have a broader impact on consumers at large." *Oswego*, 85 N.Y.2d at 25.  Courts have repeatedly held that a Section 349 consumer "is one who purchase[s] goods and services for *personal, family or household use.*" *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs.,*

26

*Inc.*, 328 F. Supp. 2d 443, 448 (S.D.N.Y. 2004) (alteration in original) (emphasis added) (internal quotation marks omitted); *see Cruz v. NYNEX Info. Res.*, 703 N.Y.S.2d 103, 106 (1st Dep't 2000) ("In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for 'personal, family or household purposes.'"). Thus, New York courts have generally found that that "when activity complained of involves the sale of commodities to business entities only, such that it does not directly impact consumers, section 349 is inapplicable." *Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 204 (E.D.N.Y. 2010) (collecting cases); *see Exxonmobil*, 328 F. Supp. 2d at 449 ("Contracts to provide commodities that are available only to businesses do not fall within the parameters of § 349.").

Plaintiff has not plausibly alleged that Defendants' conduct in connection with the upweighting and Canadian Customs schemes is consumer-oriented – *i.e.*, that it affects customers purchasing shipping services for personal, family, or household purposes. Plaintiff itself is an online retailer that shipped hundreds of packages weekly via FedEx Ground. (SAC ¶¶ 21, 51.) As a business, Plaintiff licensed FedEx's automation software to process its shipments (including to print shipping labels and schedule pick-ups), and purchased a FedEx-authorized scale for weighing its packages. (*Id.* ¶¶ 23-24.) These are not the hallmarks of an individual consumer using FedEx Ground shipping services for personal, family, or household purposes. Furthermore, it appears that the alleged upweighting and Canadian Customs schemes – which rely on a "labyrinthine and corrupt BRE Model" that, among other things, "disaggregates charges" and makes it difficult to identify inflated charges – would be effective only against high-volume shippers, *i.e.*, commercial customers. In Plaintiff's own words, the alleged schemes "rel[y] upon and exploit[] the fact that *customers who move large numbers of packages daily*

27

generally have neither the time nor the resources to cost-effectively reconstruct the undifferentiated mass of disaggregated charges in order to verify whether the total charge for the shipment of any single package is accurate or contains overcharges concealed in the labyrinth of data." (*Id.* ¶ 47.E.iii (emphasis added).)  An individual consumer – one shipping for personal, family, or household purposes – is not one "who moves large numbers of packages daily," and is thus not one for whom identifying an overcharge is difficult or impossible.[16]  Indeed, Plaintiff has not plausibly alleged that any individual consumer is affected by the upweighting or Canadian Customs schemes.  Accordingly, the Motion to Dismiss Count V is granted.

## IV.    **Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2).  It is within the sound discretion of the district court to grant or deny leave to amend. *McCarthy*, 482 F.3d at 200.  "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Amendment is futile when the claim as amended cannot "withstand a motion to dismiss pursuant to Rule 12(b)(6)," and "[i]n deciding whether an amendment is futile, the court uses the same standard as those governing the adequacy of a filed pleading." *MacEntee v. IBM*, 783 F. Supp. 2d 434, 446 (S.D.N.Y. 2011) (internal quotation marks omitted), *aff'd*, 471 F. App'x 49 (2d Cir. 2012) (summary order).  Where the problem with a claim "is substantive . . . better pleading will

---

[16] For example, a consumer dropping off packages at a FedEx store presumably watches the packages being weighed and receives a bill on the spot, and would therefore not be subject to the "labyrinthine" invoice scheme allegedly designed to obscure upweighting.

not cure it," and "[r]epleading would thus be futile." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

At a pre-motion conference held on July 29, 2011, Defendant sought leave to file a motion to dismiss. Based on the issues raised at that conference and the associated letters requesting the conference, I gave Plaintiff a second chance to amend its pleadings, and stated that there would be no further leave to amend. Plaintiff's failure to fix some deficiencies in its previous pleadings alone is sufficient ground to deny leave to amend *sua sponte*. *See In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted); *see also Ruotolo*, 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend"). Further, Plaintiff has not requested leave to file a Third Amended Complaint or otherwise suggested that it is in possession of facts that could cure the pleading deficiencies. Accordingly, I decline to grant Plaintiff leave to amend *sua sponte* with respect to the dismissed claims. *See, e.g., Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (no error in failing to grant leave to amend where it was not sought); *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 n.7 (2d Cir. 1980) ("[A]ppellants never sought leave to amend their complaint either in the district court or as an

29

alternative form of relief in this court after [appellee] raised the issue of the sufficiency of appellants' complaint. Accordingly, we see no reason to grant such leave *sua sponte*.").

**V.**     **Conclusion**

For the reasons above, Defendants' Motion to Dismiss as to Counts II, IV, and V is GRANTED. Defendants' Motion to Dismiss as to Counts I and III is DENIED. The Clerk of the Court is respectfully directed to terminate the pending motion, (Doc. 42). The parties are directed to appear for a conference on **October 26, 2012** at 10:15 a.m.

**SO ORDERED.**

Dated: September 25, 2012
         White Plains, New York


                                          _____
                                          CATHY SEIBEL, U.S.D.J.